UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

BARBARA COX )
 )
V. ) NO. 2:09-CV-6
 )
MICHAEL J. ASTRUE, )
Commissioner of Social Security )

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636, for a report and recommendation with regard to the plaintiff's appeal of the administrative denial of her applications for disability insurance benefits and supplemental security income under the Social Security Act. Both the plaintiff and the defendant Commissioner have filed Motions for Summary Judgment. [Docs. 8 and 12].

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision

must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human Services*, 846 F.2d 345, 349 (6th Cir. 1988).

Plaintiff was 50 years of age at the time the Administrative Law Judge ["ALJ"] issued his hearing decision on March 28, 2007, and 46 years old at the time of her alleged onset of disability on October 8, 2003. She has past relevant work experience as a solderer and as a telemarketer. Both occupations are defined as semi-skilled and sedentary. She has a high school education. Plaintiff alleges that she is disabled due to allergies, asthma, back pain, depression, nerves, acid reflux disease, high blood pressure and headaches.

The plaintiff's medical history is recounted in plaintiff's brief as follows:

> Plaintiff presented to Dr. Douglas A. Wright on November 17, 2000, upon referral by Dr. Jones and Dr. Watts for burning and pain in the arms. Plaintiff reported a constant burning sensation at the apex of the shoulder blade, with very sensitive skin over the area; bilateral forearm pain with a burning sensation down the proximal part of the right upper arm and sensitivity to the skin; bilateral tingling in the hands, which wakes her up at night and involves all of her fingers; intermittent numbness in the legs, which is becoming more persistent and worse when she sits; difficulty with strength in the upper extremities and difficulty opening jars; and urinary frequency and urgency. Past medical history was positive for asthma, high blood pressure, intermittent palpitations, history of back pain, history of stomach troubles, and nervousness. Notes from Dr. Watts were reviewed and noted to reflect trigger points over the scapula musculature. In summary, Dr. Wright noted Plaintiff seems to have a subjective sense of neuropathic pain down her right arm with numbness of both hands and feet; the first order would be to rule out cervical spinal cord disease; we also need to consider polyneuropathies, although this would be somewhat unusual; and, as far as her muscle pain, she does have some trigger points, there may be some component of myofascial pain (Tr. 120-122). On November 29, 2000, cervical spine x-rays showed disc space narrowing at C5-6, with small anterior and posterior osteophytes at this level. The impression was disc degeneration with spurring at C5-6. MRI of the cervical spine revealed a focal right posterior disc extrusion at C4-5, with slight right anterior cord compression with evidence of right C5 nerve root compression; narrowed and degenerated disc at C5-6, with annular bulge, posterior osteophyte, and mild neural foraminal narrowing at this level; and minimal central protrusion at C6-7. The impression was right posterior disc extrusion at C4-5 resulting in slight right anterior cord compression and focal right C5 nerve root compression, with clinical correlation as to any signs or symptoms of a right C5 radiculopathy recommended. EMG and nerve conduction studies were normal (Tr. 123-127). Plaintiff returned on December 15, 2000,

at which time Dr. Wright reviewed the cervical x-ray, noted to show degenerative spurring at C5-C6, and the MRI of the cervical spine noted to show a posterior right-sided disc extrusion with C5 nerve root compression at C4-C5. Dr. Wright felt the C4-C5 herniated disc could certainly explain Plaintiff's neuropathic pain over her scapula region and could certainly be causing her symptoms and that some of her other sensation, such as muscle spasms and knots forming in the muscles of her back, could be from subsequent myofascial pain. Dr. Wright recommended evaluation by a surgeon to see if disc removal would be a possibility (Tr. 118-119).

Plaintiff received treatment at Appalachian Neurosurgical Clinic from January 29, 2001 through January 23, 2002, due to ongoing parascapular pain, neck pain, bilateral arm pain in the proximal dorsum of both forearms, bilateral arm weakness, lower back pain, and significant weight gain (Tr. 128-135). On January 29, 2001, Dr. Hines noted MRI of the cervical spine which revealed a herniated disc/osteophytic bar at C4-5 on the right, which is consistent with Plaintiff's current neuropathic pain issues, but not relevant to her bilateral epicondylitis. Dr. Hines opined Plaintiff's scapular pain, shoulder pain, and right arm pain are definitely due to her C4-5 herniation (Tr. 132-133). On March 1, 2001, Dr. Hines opined Plaintiff is at maximum medical improvement; she still have some discomfort from her cervical disc syndrome; and she has a permanent partial impairment rating of 6%. Dr. Hines opined Plaintiff should not lift over 20 pounds; could not work over her head; and has to have the ability to change positions every 30 minutes (Tr. 131). On January 2, 2002, MRI of the cervical spine showed degenerative change with loss of the right curvature, predominantly at C4 through C6; an asymmetric broad based osteophyte to the right causing effacement of the anterior epidural space at C4-5, with significant narrowing of the neural foramen; and a broad based osteophyte creating mild canal stenosis and effacement of the anterior epidural space at C5-C5, with mild narrowing of the left neural foramen which appears to be predominantly secondary, but small disc protrusion to the left 5-6 could not be excluded (Tr. 134). On January 23, 2002, Dr. Hamel reviewed the new MRI scan, noted to show significant osteophyte at C4-5. Dr. Hamel noted Plaintiff has multi-level degenerative disc disease which he thinks is responsible for most of her neck pain; however, he thought there was very little he could do for her from a surgical standpoint (Tr. 128).

Plaintiff received treatment at Appalachian Pain Rehab Associates from August 10, 2001 through February 19, 1002. Dr. Tchou provided pain rehabilitation including injections, medication management, and home exercise program instruction and review. During this time, Plaintiff was suffering neck pain radiating into the right upper extremity, right shoulder pain, back pain with muscle spasms and tendonitis, cervical disc herniation with degenerative changes, right cervical neck and shoulder chronic sprain with muscle spasms and tendonitis, weight gain, decreased cervical range of motion, and bilateral SI joint pain (Tr. 136-174).

Plaintiff received treatment at Psychiatric Associates of Kingsport from January 7, 2002 through September 9, 2002, due to marital problems, depression, sleep disturbance, crying spells, anhedonia, helplessness, hopelessness, history of childhood sexual abuse, anxiety, and social isolation. During this time, Plaintiff carried the

3

diagnosis of major depressive disorder, single, moderate, with a global assessment of functioning [hereinafter "GAF"] of 50 (Tr. 175-181).

Plaintiff underwent limited consultative exam by Dr. Karl W. Konrad on March 3, 2003, at which time decreased lumbar range of motion was noted. Lumbar spine x-rays showed six lumbar spinal bodies with transitional L1, as well as congenital abnormalities involving L6 and the right ilium. In addition, the L6-S2 space was only 30% of expected height. Dr. Konrad did not offer a diagnosis or opinion regarding limitations (Tr. 183).

Plaintiff underwent another limited consultative exam by Dr. Konrad on August 25, 2003, at which time she was noted to limit range of motion of the lumbar spine to five degrees of lateral bending to either side with five degrees of backward extension and 15 degrees of forward flexion. Again, Dr. Konrad does not offer a diagnosis or opinion regarding limitations (Tr. 365).

Plaintiff underwent consultative exam by Dr. Rexford F. Burnette on August 26, 2003. Plaintiff was extremely preoccupied with her estranged husband and attempted to talk about him and their relationship problems exclusively; she had to be continuously redirected; her mood was somewhat tense; and she was very ruminative regarding her estranged husband and his alleged escapades. Although no hallucinations or delusions were reported, Dr. Burnette felt Plaintiff's allegations regarding her estranged husband's homosexual encounters with a man who had had a sex-change operation may need further exploration. Plaintiff reported that she doesn't have a life and that she always takes someone with her when she goes shopping as she fears her estranged husband might do something to her. Dr. Burnette noted Plaintiff's intense preoccupation with her estranged husband may be an impediment in many social situations. The diagnosis was anxiety disorder not otherwise specified, with a current GAF of 59. Dr. Burnette opined Plaintiff's ability to understand and remember is not significantly limited; her sustained concentration and persistence is moderately limited, due to her anxiety and intense preoccupation with marital stressors; her social interaction is not significantly limited, although she is fearful of going anywhere alone in case her estranged husband is stalking her; and her ability to tolerate/adapt to stress associated with day-to-day activity is moderately limited, due to anxiety (Tr. 366-369).

On May 3, 2005, Plaintiff underwent consultative exam by Kathy Birchfield, M.Ed. Plaintiff reported that she is sad about her current situation most of the time because she is not able to do things as before; that she has been prescribed psychotropic medications since 2002; that she is depressed over not being able to be physically active like she was before and having to have her mother help her financially; and that she is more introverted than before. Plaintiff further reported sadness, decreased appetite, lost interest in activities, decreased sleep, decreased energy, anxiety, memory difficulty, and anger and frustration problems. On exam, plaintiff was somewhat anxious and depressed and her affect was tearful at times. The diagnosis was depressive disorder not otherwise specified, with a current GAF of 55. In summary, Ms. Birchfield noted Plaintiff does appear to have some depressive symptoms related to her change in lifestyle, but her overall adaptation appears to be in the mild impairment range (Tr. 395-399).

4

Plaintiff received physical therapy at Buc Sports from July 25, 2003 through January 13, 2005. Treatment was rendered for back pain, neck pain, difficulty performing activities of daily living secondary to pain and paresthesia, poor posture, and increased pain with range of motion movements. By the end of treatment, Plaintiff continued to have back pain; continued to have increased pain with thoracolumbar range of motion; and continued to have increased tenderness to the right medial/inferior parascapular region. Physical therapy was discontinued secondary to lack of improvement (Tr. 348-364).

Plaintiff received treatment at ETSU Family Medicine from March 26, 2003 through October 11, 2005. Conditions and complaints addressed include depression, musculoskeletal pain, asthma, chronic back pain, insomnia, anxiety, poorly controlled gastroesophageal reflux disease [hereinafter "GERD"], nervousness, upper respiratory infection, constant fatigue, allergies, muscle spasms, crying spells, stress, neck pain and stiffness, chronic pain syndrome, left ankle pain, urinary frequency, fibromyalgia, easy bruising, abdominal pain, hot flashes, chronic epigastric pain, chronic constipation, ribcage pain, irritable bowel syndrome, social isolation, headaches, right knee pain, high blood pressure, shoulder pain, right arm pain, occasional numbness of the lower extremities, decreased cervical range of motion, and hypercholesterolemia (Tr. 192-347).

Additional records were received from Johnson City Medical Center. On April 30, 2001, left foot x-rays showed mild hallux valgus with some associated degenerative change in the first metatarsal phalangeal joint, as well as mild hammer toe deformity. Right foot x-rays showed mild to moderate hallux valgus with associate, more severe than on the left side, as well as bunion formation and mild hammer toe deformity (Tr. 434). On August 28, 2001, MRI of the lumbar spine showed a minimal amount of disc bulging at L3-L4, greater on the right, with minimal facet and ligamentous hypertrophic changes. L4-L5 also had a very minimal amount of disc bulging with facet and ligamentous hypertrophic changes (Tr. 433).

Plaintiff continued treatment at ETSU Family Medicine from October 17, 2005 through August 14, 2006. During this time, Plaintiff was suffering pelvic pain, sacral pain, asthma, persistent fatigue, bronchitis, bilateral shoulder and arm pain, right shoulder somatic dysfunction, osteoarthritis, neck pain and stiffness, generalized stiffness, hypercholesterolemia, generalized all over pain and achiness, right forearm somatic dysfunction, chronic back pain, thoracic and cervical spine somatic dysfunction, bilateral lower extremity edema, epigastric pain, GERD, neck pain, dizziness, weakness, shortness of breath, sleep disturbance, headaches, allergies, rib pain, leg pain, joint pains, depression, muscle stiffness and spasms, herniated cervical discs, and tearfulness (Tr. 437-517). On April 3, 2006, MRI of the sacrum showed a mild increase in bone marrow signal intensity at the coccyx which may represent a nondisplaced fracture (Tr. 425, 512, 515).

[Doc. 9, pgs. 2-8].

5

At the administrative hearing, the ALJ received testimony from Donna Bardsley, a Vocational Expert ["VE"].  He asked Ms. Bardsley to assume a person of plaintiff's "height, weight, education and work background."[1]  He then asked her to assume that the plaintiff had the residual functional capacity for light and medium work.  He then asked her to assume the plaintiff "has an emotional disorder with restrictions regarding her ability to perform work-related activities consistent with Miss Birchfield's report..."  When asked if there were any jobs such a person could perform, she identified the jobs of sorters, assemblers, inspectors, cashiers, sales clerks and food service occupations.  At the medium level, there would be 8,000 jobs in the region and 9,000,000 in the nation.  At the light level there would be 10,000 jobs in the region and 11,000,000 in the nation.  (Tr. 601-02).

In his hearing decision, the ALJ found that the plaintiff had no severe mental impairment.  He found she did have degenerative disc disease of the cervical spine and back pain, which he determined were her only severe impairments.  As for her residual functional capacity, the ALJ stated "[f]ollowing a thorough review of the evidence, the Administrative Law Judge concludes that the claimant has the residual functional capacity to perform medium work.  This conclusion is consistent with the opinion of the State Agency medical consultant set out in [Tr. 400-05]."  (Tr. 20).

With these limitations, the ALJ determined that she could return to her past relevant work.  He also found that she could perform the jobs identified by the VE at the hearing.  Since the plaintiff could engage in substantial gainful activity, the ALJ found that she was not disabled.

---

[1] Curiously, he did not ask her to assume the individual to be of plaintiff's age.

Plaintiff first asserts that the ALJ erred in his description of the plaintiff's residual functional capacity. Plaintiff states that rather than just finding that the plaintiff "can do meidum work," *Social Security Ruling 96-8p* requires a detailed statement of her RFC "on a function by function basis," such as weight to be lifted, hours which can be spent standing and walking, etc. That ruling also requires the ALJ to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). The defendant Commissioner points out that the ALJ did in fact elaborate, stating that he considered her subjective complaints but found that "[t]he objective evidence fails to document an impairment or combination of impairments of such severity as would preclude work in the medium range of exertions. Clinical exams and diagnostic testing fails to document significant cervical or lumbar abnormalities. While the claimant has neck and back pain, the evidence shows she is able to sit, stand, walk, bend, move about, and use her upper and lower extremities in a satisfactory manner. (Tr. 21). This argument by the plaintiff is not persuasive.

Plaintiff's next argument is more serious. Plaintiff points out that the opinion of Dr. Hines of March 1, 2001 (Tr. 131), is the only assessment by an examining physician in this record.[2] The defendant Commissioner counters with the argument that Dr. Hines, who saw plaintiff for her neck and back pain three times in early 2001, should not be considered a "treating physician" under an unreported Sixth Circuit case, *Daniels v. Commissioner of*

---

[2] The Court has no idea why Dr. Konrad, or some other consultative physician, was not asked to examine the plaintiff and provide a medical assessment of her physical capabilities.

7

*Social Security*, 152 Fed. Appx. 485 (6th Cir. 2005) and regulations dealing with treating sources. In *Daniels*, the Court focused on the fact that the doctor at issue had seen the plaintiff on only two occasions three days apart for complaints of back pain. The opinion made no mention of any testing, x-rays taken, or other objective findings of that physician. In fact, the opinion stated that much of what the doctor said was a parroting of that plaintiff's subjective complaints.

Dr. Hines, of Appalachian Neurosurgical Clinic, saw the plaintiff initially on January 29, 2001, apparently on referral from Doug Wrighy, D.C.. Besides Wright's notes, he also was provided with the plaintiff's records for several years from Holston Medical Group. Dr. Hines performed a detailed and careful physical exam. He obtained an M.R.I. He elected to treat her conservatively with anti-inflammatory medication and steroids. Only if those failed would he consider surgical intervention, but he vowed to "follow her until this issue has been resolved." (Tr. 132-33). On March 1, 2010, apparently on a followup visit, he opined that plaintiff had reached maximum medical improvement. At that time he opined she should not lift over 20 pounds, not work over her head, and have the ability to change positions every 30 minutes. (Tr. 131). She saw Dr. Hines again on April 9, 2001, and further treatment with Dr. Sheng Tchou was recommended (Tr. 129). She was seen by Dr. Hines' partner, Dr. Steven C. Hamel, on December 19, 2001. Dr. Hamel evaluated her further and elected to have another MRI performed (Tr. 129). On January 23, 2002, Dr. Hamel saw the plaintiff again and reviewed her MRI. He concluded that there was little he could do from a surgical standpoint and that she should continue with her treatments by Dr. Tchou (Tr. 128).

8

The Court respectfully disagrees with the Commissioner that the treatment relationship between this plaintiff and Dr. Hines is synonymous with that of the plaintiff and the doctor in *Daniels*. That being said, the ALJ could certainly have weighed Dr. Hines' opinion and accorded it weight in accordance with other evidence, the case law, and the applicable regulations. But the ALJ did not even mention Dr. Hines' examination, MRI or treatment of plaintiff, much less the assessment of her physical capabilities. Instead he relied on the opinion of a non-examining state agency physician to determine she could do the full range of medium work.

The Commissioner's argument that a specialist who saw the plaintiff three times to evaluate and treat her condition can be casually ignored in the adjudicative process appears to start down a very slippery slope when so many of these cases are resolved in the Commissioner's favor because of the medical assessments of one-time consultative examiners retained by the Commissioner to determine a plaintiff's physical or mental capabilities, even against opinions of doctors who are indisputedly treating physicians.

It is no less of a slippery slope for the Commissioner to say that the opinions of non-examining state agency physicians (Tr. 184-91 and 387-92) could be totally ignored in favor of that of a *third* non-examining state agency physician who provided the highest exertional capacity. It is most tempting to say that the Commissioner should never argue in future cases that non-examining state agency physician's assessments tip the balance in the Commissioner's favor. Consistency may be the hobgoblin of little minds, but in the adjudication of disputes it is the sole source of public credibility and fairness.

The lack of substantial evidence regarding the plaintiff's residual functional capacity

9

taints this entire adjudication. However, the Court does not consider this to be an appropriate case for an outright award of benefits. The case should be remanded to the Commissioner for a detailed consultative examination and physical medical assessment of the plaintiff's capabilities. It is therefore respectfully recommended that the plaintiff's Motion for Summary Judgment [Doc. 8] be GRANTED in its request for a remand, and that the defendant Commissioner's Motion for Summary Judgment [Doc. 12] be DENIED.[3]

Respectfully submitted:

s/ Dennis H. Inman
United States Magistrate Judge

---

[3] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).